RAYMOND SANTOPIETRO, JR., ET AL. *v.* CITY OF
NEW HAVEN ET AL.
(15355)

Callahan, Borden, Berdon, Katz and Palmer, Js.

Argued May 1—officially released August 27, 1996

*Robert A. Solomon,* with whom, on the brief, was *Katerina Rohner,* for the appellants (plaintiffs).

*Christopher M. Vossler,* with whom, on the brief, was *Linda Gray MacDonald,* for the appellees (defendants).

BORDEN, J. This appeal arises out of injuries incurred by a spectator at a softball game. The issues are whether: (1) the plaintiffs' failure to file a motion to set aside the verdict limits the scope of our appellate review to plain error; (2) the trial court improperly directed a verdict in favor of the defendant umpires; and (3) the trial court improperly granted a motion in limine to preclude evidence of bystander emotional distress. We affirm the judgment of the trial court.

Certain facts are not in dispute. On October 16, 1988, the plaintiffs attended a softball game played at East Shore Park in New Haven by teams belonging to an organized league. The defendants David Brennan and Bruce Shepard served as the umpires for that game. The defendant Mark Piombino was a participant in the game.

The plaintiff Raymond Santopietro, Jr., observed the softball game from a position behind the backstop and was not on the field of play. The plaintiff Raymond Santopietro, Sr., was approximately ten to fifteen feet from his son watching another game being played on an adjacent field.

In the sixth inning, Piombino came to bat in the game that Santopietro, Jr., was watching and hit a fly ball. In frustration, he intentionally flung his bat toward the backstop. Somehow the bat passed through the backstop and struck Santopietro, Jr., in the head. As a result,

Santopietro, Jr., suffered a fractured skull and other serious injuries.

Both Santopietro, Jr., and Santopietro, Sr.,[1] appeal[2] from the judgment of the trial court, *Hon. John C. Flanagan*, state trial referee, in favor of the defendants[3] rendered following the court's granting of a motion in limine precluding the claim of Santopietro, Sr., for bystander emotional distress, and following a directed verdict in favor of Brennan and Shepard on Santopietro, Jr.'s claim of negligence. Thereafter, the jury rendered a verdict in favor of Santopietro, Jr., against Piombino.[4] The plaintiffs did not file a postverdict motion, either to set aside the directed verdict in favor of Brennan and Shepard, or in any way raising again the ruling of the court on the motion in limine regarding the claim of Santopietro, Sr., for bystander emotional distress. The trial court rendered judgment for Brennan and Shepard, and for Santopietro, Jr., against Piombino. This appeal followed.

Santopietro, Jr., claims that the trial court improperly directed a verdict for Brennan and Shepard on his claim

---

[1] Santopietro, Sr., died during the pendency of this action. Accordingly, Sandra Diane Santopietro, acting as executrix of his estate, was substituted as a party plaintiff for Santopietro, Sr. We refer to Santopietro, Sr., however, as the plaintiff.

[2] The plaintiffs appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to Practice Book § 4023 and General Statutes § 51-199 (c).

[3] The original defendants were: the city of New Haven, which owns East Shore Park; Robert Sheeley, the director of the department of parks, recreation and trees for the city of New Haven; Edward Candella, the assistant superintendent of parks for the city of New Haven; John Hiller, a foreman in the department of parks, recreation and trees for the city of New Haven; Caccone's Sunday Morning League; Brennan; Shepard; and Piombino.

The trial court, *O'Keefe, J.*, granted a motion for summary judgment on behalf of the city of New Haven, Sheeley, Candella and Hiller. The plaintiffs do not appeal from the summary judgment rendered in favor of those defendants. The plaintiffs withdrew their complaint against Caccone's Sunday Morning League prior to the commencement of the trial. The action was tried solely against Brennan, Shepard and Piombino.

[4] The judgment against Piombino is not involved in this appeal.

against them. Santopietro, Sr., claims that the trial court improperly ruled against his claim for bystander emotional distress. We affirm the judgment of the trial court in both respects.

I

Before addressing the merits of the plaintiffs' claims on appeal, we consider our scope of review regarding those claims. Because the plaintiffs did not file a motion to set the verdict aside, our scope of review would, under our prevailing precedent of *Pietrorazio* v. *Santopietro*, 185 Conn. 510, 515–16, 441 A.2d 163 (1981), be limited to determining whether the trial court's actions constituted "plain error" requiring reversal of the judgment. The plaintiffs argue, however, that we should overrule *Pietrorazio*, and review their claims unburdened by the plain error doctrine. We agree.

We are mindful of the doctrine of stare decisis, especially when it involves the interpretation of a statute, as *Pietrorazio* does. "Stare decisis gives stability and continuity to our case law. This court, however, has recognized many times that there are exceptions to the rule of stare decisis. . . . A court, when once convinced that it is in error, is not compelled to follow precedent. . . . If, however, stare decisis is to continue to serve the cause of stability and certainty in the law—a condition indispensable to any well-ordered system of jurisprudence—a court should not overrule its earlier decisions unless the most cogent reasons and inescapable logic require it. . . . This is especially true when the precedent involved concerns the interpretation or construction of a statute. . . . *Herald Publishing Co.* v. *Bill*, 142 Conn. 53, 62, 111 A.2d 4 (1955); see *Kluttz* v. *Howard*, 228 Conn. 401, 406, 636 A.2d 816 (1994); *White* v. *Burns*, 213 Conn. 307, 335–36, 567 A.2d 1195 (1990)." (Internal quotation marks omitted.) *General Electric Employees Federal Credit Union* v. *Zakrzewski*, 235

Conn. 741, 744, 670 A.2d 274 (1996). We conclude that this is a case in which cogent reasons and inescapable logic require that *Pietrorazio* be overruled.

*Pietrorazio* was a medical malpractice action in which the jury returned a verdict for the defendant physicians. The plaintiff patient appealed, claiming that: (1) the verdict was against the weight of the evidence; and (2) several evidentiary rulings of the trial court were erroneous. *Pietrorazio* v. *Santopietro*, supra, 185 Conn. 511. The plaintiff had not, however, filed a motion to set aside the verdict in accordance with Practice Book § 320[5] and General Statutes § 52-228b.[6] Id., 512. We held that "[o]ur conclusion that a motion to set aside a verdict is essential for a full review of claims of error in civil jury cases seeking money damages limits our consideration of the issues raised . . . to ascertaining whether there has been 'plain error.' Practice Book § [4185]."[7] Id., 515. Pursuant to that "limited

---

[5] Practice Book § 320 provides: "Motions in arrest of judgment, whether for extrinsic causes or causes apparent on the record, motions to set aside a verdict and motions for new trials, unless brought by petition served on the adverse party or parties, must be filed with the clerk within five days after the day the verdict is accepted or judgment rendered; provided that for good cause the court may extend this time. The clerk shall notify the trial judge of such filing. Such motions shall state the specific grounds upon which counsel relies."

[6] General Statutes § 52-228b provides: "No verdict in any civil action involving a claim for money damages may be set aside except on written motion by a party to the action, stating the reasons relied upon in its support, filed and heard after notice to the adverse party according to the rules of the court. No such verdict may be set aside solely on the ground that the damages are excessive unless the prevailing party has been given an opportunity to have the amount of the judgment decreased by so much thereof as the court deems excessive. No such verdict may be set aside solely on the ground that the damages are inadequate until the parties have first been given an opportunity to accept an addition to the verdict of such amount as the court deems reasonable."

[7] Practice Book § 4185 provides in relevant part: "The court on appeal shall not be bound to consider a claim unless it was distinctly raised at the trial or arose subsequent to the trial. The court may in the interests of justice notice plain error not brought to the attention of the trial court. . . ."

study" of those rulings, we affirmed the trial court's judgment.[8] Id., 517.

Central to our conclusion in *Pietrorazio* was our interpretation of § 52-228b. See footnote 6. We recognized that, prior to the enactment of that statute in 1965, it had been thought that a motion to set aside a verdict was essential to obtain appellate review of a claim of evidentiary insufficiency to support a verdict.[9] Id., 513. We also recognized that commentators had opined that such a motion was not necessary to obtain appellate review of other trial court rulings, because in their view it would be redundant to require such a motion in those contexts. Id., 514.

We concluded, however, that the "enactment in 1965 of General Statutes § 52-228b, which declares that '[n]o verdict in any civil action involving a claim for money damages shall be set aside except on written motion by a party to the cause . . .' is applicable to this case and is controlling." Id. We stated that "[t]he evident

---

[8] In a footnote in that opinion, however, we stated: "It must not be inferred from the fact that we have based our opinion on 'plain error' that explicitly addressing all the plaintiff's claims would produce a different result; in fact, our review indicates the outcome would be the same." *Pietrorazio* v. *Santopietro*, supra, 185 Conn. 517 n.5. Thus, we also afforded the plaintiff's appellate claims plenary review, despite the fact that no motion to set the verdict aside had been filed.

Subsequent to *Pietrorazio*, we applied its holding beyond the context of a jury award of damages. Thus, in *Atlantic Richfield Co.* v. *Canaan Oil Co.*, 202 Conn. 234, 249–50, 520 A.2d 1008 (1987), we held that, in order for an appellant to obtain full review of a trial court's ruling directing a verdict, he must have filed a motion to set aside the verdict, and that the failure to do so limited our review to a consideration of plain error. See also *Saporoso* v. *Aetna Life & Casualty Co.*, 221 Conn. 356, 361–63, 603 A.2d 1160 (1992); *Dunham* v. *Dunham*, 204 Conn. 303, 310–11, 528 A.2d 1123 (1987). Moreover, in *Dunham* v. *Dunham*, 217 Conn. 24, 28–29, 584 A.2d 445 (1991), we applied the rationale of *Pietrorazio* to a judgment of contempt of court rendered after a hearing to the trial court, without any jury verdict.

[9] We need not decide in this case whether that understanding, namely, that a motion to set a verdict aside is essential to full appellate review of a claim of insufficiency of the evidence to support a civil verdict, is correct.

purpose of the statute is to provide an opportunity for the trial court to pass upon claims of error which may become the subject of an appeal." Id. We declared that "[t]he statute was designed to afford the trial court a full opportunity to redress any errors which may have occurred at trial before the appellate process is begun." Id., 515.

We also noted several policy reasons for requiring a motion to set aside the verdict as a prerequisite for full appellate review of rulings other than those involving the sufficiency of the evidence to support the verdict. These were, in general, that: (1) the trial court's opinion on such a motion may dissuade a party from pursuing an unmeritorious appeal; (2) the trial court's perceptions of the trial may be helpful to the appellate court in evaluating the effect of the trial court's ruling on the verdict; and (3) even when a claim of error has been fully preserved at trial, its articulation during trial will not be as clear and thorough as when it is presented in a posttrial motion. Id., 514–15.

From the statutory language, the previously described understanding of the purpose of the statute, and these policy considerations, we concluded that the statute must be read to circumscribe our scope of appellate review of claims of trial court error that had not been made the subject of a motion to set aside a verdict. Id., 515. We also noted, however, that pursuant to Practice Book § 4185, we could nonetheless address such claims under the plain error doctrine. Id., 515–16.

We subsequently reiterated our reliance on the statutory language and supporting policy considerations as the continued justification for the *Pietrorazio* rule. In *Saporoso* v. *Aetna Life & Casualty Co.*, 221 Conn. 356, 362–63, 603 A.2d 1160 (1992), we noted "the breadth of the first sentence of the statute, which provides that '*[n]o* verdict in any civil action . . . may be set aside

except on written motion . . . .' (Emphasis added.)
There is no ambiguity in that language to justify a distinction between motions to set aside for insufficient evidence and those based on rulings during the course of the trial. In applying a statute this court is bound by its terms and cannot read into its plain language exceptions that the legislature has not created." We also noted four policy considerations for the rule: (1) it permits the trial court to reconsider its rulings in the less hectic atmosphere of posttrial proceedings, and to grant a new trial if required, without the necessity of an appeal; (2) it gives the court an opportunity to explain its rulings more clearly than is possible during trial; (3) it gives the parties an opportunity to present their arguments more persuasively and clearly than is ordinarily possible during trial; and (4) it may induce settlement of the litigation by forcing the parties to reevaluate their positions in light of the verdict. Id., 363.

We now conclude that our statutory analysis was flawed. We conclude that the text of the statute neither compels nor suggests a conclusion that the statute circumscribes in any way our scope of appellate review. Moreover, contrary to our earlier statements, the text of the statute suggests that its purpose is to ensure the fairness of postverdict trial court procedures, and not to affect the scope of appellate review of trial court rulings. Furthermore, we conclude that the *Pietrorazio* rule imposes costs on both the trial and appellate processes that are unacceptable, which we did not take into account when *Pietrorazio* was decided. Finally, although we agree, for all of the policy reasons previously noted, that it is highly desirable, both from a trial court and appellate court perspective, that parties continue to file motions to set aside jury verdicts, we conclude that there is nothing in the statute or those laudable policies that makes such motions essential to full appellate review of trial court rulings.

We first note that the initial appellate determination of whether to review a claimed improper ruling of the trial court in a plenary fashion or under the plain error doctrine is more than a matter of phraseology. Determining whether a trial court has committed plain error that requires reversal is quite different from determining whether a trial court has made a ruling that is legally incorrect and that is sufficiently harmful to require reversal of the judgment. Where claims of trial court impropriety have been properly preserved and, therefore, are entitled to plenary review, we determine whether the ruling of the trial court is legally correct and, if it is not, whether the error was likely to have affected the verdict. See, e.g., *Williams Ford, Inc.* v. *Hartford Courant Co.*, 232 Conn. 559, 572, 657 A.2d 212 (1995) (appellant must show that improper ruling " 'would likely affect the result' ").

In determining whether there has been plain error, however, our scope of review is much more circumscribed. "Plain error review is reserved for truly extraordinary situations where the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings." (Internal quotation marks omitted.) *Westport Taxi Service, Inc.* v. *Westport Transit District*, 235 Conn. 1, 25, 664 A.2d 719 (1995). In any given case, therefore, rulings of the trial court that, if reviewed in a plenary fashion, would be judged to be legally incorrect and harmful enough to require reversal of the judgment could, if considered only under the plain error doctrine, be considered not to be so egregiously incorrect as to constitute plain error requiring reversal. In effect, then, confining an appellate claim to the plain error rubric means that, for reasons of policy, we are willing to take the appellate risk of sanctioning a legally flawed trial court judgment.

With this consideration in mind, we turn first to the language of § 52-228b, which provides: "No verdict in

any civil action involving a claim for money damages may be set aside except on written motion by a party to the action, stating the reasons relied upon in its support, filed and heard after notice to the adverse party according to the rules of the court. No such verdict may be set aside solely on the ground that the damages are excessive unless the prevailing party has been given an opportunity to have the amount of the judgment decreased by so much thereof as the court deems excessive. No such verdict may be set aside solely on the ground that the damages are inadequate until the parties have first been given an opportunity to accept an addition to the verdict of such amount as the court deems reasonable."

There is nothing in this language that suggests that it was meant to affect the scope of review of appellate claims.[10] Rather, the focus of § 52-228b is on requirements of fundamental fairness in postverdict proceedings. The first sentence, which applies generally to the setting aside of a civil verdict for money damages,

[10] Indeed, the question of the appellate scope of review of trial court rulings, although of keen interest to appellate court judges and rule makers, is ordinarily unlikely to be on any legislative agenda. We should be cautious, therefore, about discerning legislative intent to address such a subject in the absence of a clear indication of such intent. Compare, e.g., General Statutes § 4-183 (j) (limiting scope of trial court review of administrative rulings). Similarly, we should be cautious about drawing any inference of legislative approval from the legislature's failure to amend the statute subsequent to our decision in *Pietrorazio*.

Neither the language of § 52-228b, which we discuss in the text of this opinion, nor its legislative history, which we discuss in this footnote, dispels that sense of caution. The legislative history of § 52-228b is sparse, and contains no reference to the preservation of appellate claims or the scope of appellate review. See 11 S. Proc., Pt. 7, 1965 Sess., p. 2589, remarks of Senator Charles T. Alfano ("Our present statute provides that before a court can set aside a verdict of a jury, if he feels that the verdict is excessive, he can order a [remittitur]. This is just the reverse: it also permits a judge to order an [additur]."); 11 H.R. Proc., Pt. 8, 1965 Sess., p. 4143, remarks of Representative Gerard S. Spiegel ("[t]his, sir, is a good bill just [conforming] the verdict and the setting aside of verdicts bills to the same prevailing law").

requires that there be a written motion, that its reasons be stated, and that it be heard only after notice to the adverse party. The second sentence, which applies to the more specific instance of a court's setting aside such a verdict on the ground of an excessive damages award, requires that the prevailing party first be given the opportunity to accept an amount that the court deems not to be excessive. Similarly, the third sentence, which applies to the specific instance of a court's setting aside such a verdict on the ground of inadequacy of the award, requires that the parties first be given the opportunity to accept an adequate award.

Thus, we discern from the language of § 52-228b that its purpose is to ensure that, before a trial court sets aside a civil verdict for damages, it abides by certain procedural requirements that afford fairness to the party who would be adversely affected by such a ruling. The purpose is to protect the litigants, not the trial court. Thus, although moving to set aside a verdict has the desirable effect of affording the trial court an opportunity to reconsider its earlier rulings, the focus of the statute is on the trial process. Contrary to our conclusion in *Pietrorazio*,[11] the focus is not on the appellate process that may or may not follow.

Furthermore, the *Pietrorazio* rule imposes significant costs on the trial court process. If a litigant takes

---

[11] Although we stated in *Pietrorazio* v. *Santopietro*, supra, 185 Conn. 515, that the appellant's claims would nonetheless be considered under the plain error doctrine, we have never explained why, if the language of the statute is so plain and unequivocal; see *Saporoso* v. *Aetna Life & Casualty Co.*, supra, 221 Conn. 362; it nonetheless permits an implied exception for plain error adjudication. Indeed, our plain error appellate rule by its terms does not apply to the typical claim that, under *Pietrorazio*, would be denied plenary appellate review. Practice Book § 4185 provides in part that "[t]he court may in the interests of justice notice plain error *not brought to the attention of the trial court.* . . ." (Emphasis added.) Claims barred from plenary review under *Pietrorazio* typically were brought to the trial court's attention, at least during the trial, albeit not a second time, pursuant to a motion to set aside the verdict.

the rule seriously, as he must at his appellate peril in order to secure traditional appellate review of any particular challenge to a trial court ruling, he must raise that claim as a specific ground for setting aside the verdict. That necessarily means, therefore, that in addition to raising such a claim appropriately either before or during trial, he must do so again in the course of the proceedings on the motion to set aside the verdict, either in the motion itself,[12] or at the least, in his brief or oral argument on the motion.

Often—indeed, probably nearly always—the motion to set aside must be briefed and argued before any transcripts of the trial have been prepared, because to order and to wait for such transcripts would be unduly expensive and cause undue delay. This necessarily means that the litigant filing the motion must often attempt to reconstruct, either from notes or memory, all of the rulings made before or during trial that he anticipates may be an ultimate ground of appeal, and marshal the factual and legal support for the challenge to all such rulings. It means also that the adverse litigant must frequently attempt to respond to these claims, likewise from notes or memory. Similarly, the trial court, in considering these claims, may be constrained to do so on the basis of its notes or memory. This is a heavy cost to impose on our trial process, one that we should not impose unless we are persuaded that its virtues make it necessary.

We are not so persuaded. Our rules already provide that we are not required to consider any claim that was

---

[12] A motion to set aside must be filed within five days of the verdict; Practice Book § 320; and some trial courts have rejected as untimely any issue not specifically raised in the motion and filed within the five day limit. See W. Moller & W. Horton, 1 Connecticut Practice Series: Practice Book Annotated—Superior Court Civil Rules (3d Ed. 1989) § 320, p. 231, comment (1996 Sup.). Thus, some courts do not permit a movant to file a general motion within the five day period and later to present specific claims in a brief or at oral argument on the motion.

not properly preserved in the trial court. See Practice Book § 4185. Therefore, litigants have ample inducement to present their claims to the trial court in such a way as to preserve them properly for appellate review. The claims that are barred by the *Pietrorazio* rule, however, are claims that were so presented and preserved once; their sole defect is that they were not presented a second time.

The rule also imposes an unacceptable cost on the appellate process. When the rule is enforced—that is, when we subject the claim in question solely to plain error adjudication—we are taking the risk, as we have noted previously, of affirming a legally flawed trial court judgment. Although that is a risk that we are willing to take to ensure that parties have properly preserved their claims of law in the trial court,[13] we conclude that there is insufficient reason to take that risk when the claims before us *have been properly preserved* but simply have not been presented a second time.

Finally, our experience with the *Pietrorazio* rule suggests that its virtues have been overstated. The policy reasons advanced for it do not support the conclusion that presenting claims to the trial court a second time

[13] We have referred to the policy reasons underlying the preservation requirement on several occasions. The policy serves, in general, to eliminate the possibility that "(1) claims of error would be predicated on matters never called to the attention of the trial court and upon which it necessarily could have made no ruling in the true sense of the word; and (2) the appellee . . . would be lured into a course of conduct at the trial which it might have altered if it had any inkling that the accused would, in the event of a conviction, claim that such a course of conduct involved rulings which were erroneous and prejudicial to him." (Internal quotation marks omitted.) *State* v. *Kurvin*, 186 Conn. 555, 564, 442 A.2d 1327 (1982); *State* v. *Brice*, 186 Conn. 449, 457–58, 442 A.2d 906 (1982); *State* v. *Johnson*, 166 Conn. 439, 445, 352 A.2d 294 (1974); *State* v. *Taylor*, 153 Conn. 72, 86–87, 214 A.2d 362 (1965), cert. denied, 384 U.S. 921, 86 S. Ct. 1372, 16 L. Ed. 2d 442 (1966); see *Skrzypiec* v. *Noonan*, 228 Conn. 1, 13, 633 A.2d 716 (1993) (purpose of rule is "to alert the trial court to claims of error while there is still an opportunity for correction").

is "essential" for adequate appellate review of those claims. In *Pietrorazio* v. *Santopietro*, supra, 185 Conn. 517 n.5, after determining that the claims did not constitute plain error, we also determined in effect that they failed under plenary review, despite the appellant's failure to have filed a motion to set aside the verdict. Thus, despite that failure, we found the record adequate to afford plenary review to the appellate claims.[14]

We conclude, therefore, that *Pietrorazio* and its progeny should be overruled. We next consider the plaintiffs' claims on their merits, affording them the plenary appellate review to which they are entitled.

## II

The plaintiffs first challenge the trial court's order directing a verdict in favor of Brennan and Shepard. The

---

[14] We have previously recognized that a motion to set aside the verdict is superfluous when the plaintiff challenges not a jury verdict, but a postverdict judgment rendered by a trial court that has fully considered the appellate issues after a hearing, arguments and the submission of briefs. *Fleming* v. *Garnett*, 231 Conn. 77, 87–88 n.9, 646 A.2d 1308 (1994) (providing plenary review to claim concerning statutory collateral source reduction despite failure to raise claim in motion to set aside verdict). We fail to discern a distinction between a postverdict judgment and a directed verdict, which also generally has been the subject of a hearing, arguments and briefs. See *Saporoso* v. *Aetna Life & Casualty Co.*, supra, 221 Conn. 373–74 (*Berdon, J.*, concurring) (where plaintiff challenges directed verdict "[i]t makes little sense to require a motion to set aside the verdict and require the same argument all over again").

In the present case, moreover, the redundancy of a motion to set aside the verdict that the trial court directed, and the absence of any compelling reason for the plaintiffs to have presented their claims once again to the court, are apparent. After the presentation of the motion for directed verdict, and after a recess, the trial court stated: "I've given this matter very serious consideration. As a matter of fact, I've been thinking about it as the trial progressed, I gave it a good deal of consideration last evening and this morning, and I've made copious notes concerning the evidence, I've reviewed my notes with respect to the testimony of every witness and every documentary type evidence that was offered in this case, and I have reached the conclusion that I have no choice but to direct a verdict in favor of [Brennan and Shepard]."

plaintiffs argue that the evidence that they produced, viewed in the light most favorable to them, would have permitted a jury reasonably to conclude that Brennan and Shepard had breached a cognizable duty to the plaintiffs, causing them injury.

"The standard of review of directed verdicts is well settled. A directed verdict is justified if on the evidence the jury could not reasonably and legally have reached any other conclusion. . . . In reviewing the trial court's action in directing a verdict . . . we must consider the evidence in the light most favorable to the plaintiff. . . . This court has repeatedly stated that directed verdicts are not favored." (Citations omitted; internal quotations marks omitted.) *Berry* v. *Loiseau,* 223 Conn. 786, 819–20, 614 A.2d 414 (1992).

A review of the evidence in the light most favorable to the plaintiffs indicates that the jury might reasonably have found the following facts. During the course of the game that Santopietro, Jr., was watching when he was injured, there occurred several incidents of unruly behavior by players who were on the same team as Piombino. Some players used vulgar language in a loud and angry manner. Players taunted members of the other team in an attempt to intimidate them. Players threw their gloves and kicked the dirt, and one player kicked a garbage can, upsetting its contents and creating a loud noise. After his turn at bat resulted in an out, another player angrily threw a bat along the ground in the direction of the bats not in use. Another player threw his glove from the pitcher's mound into the dugout. A player inside the dugout repeatedly banged a bat against the dugout, producing a loud noise. Furthermore, the jury could have inferred from the evidence presented that Brennan and Shepard were aware or reasonably should have been aware of these incidents.

After passing a written examination, Brennan and Shepard were both trained and approved to be softball

umpires by the Amateur Softball Association (association), a national organization that regulates the conduct of organized amateur softball in the United States. Both Brennan and Shepard possessed years of experience and had umpired hundreds of games. Shepard had received an award honoring him for being the best umpire in New Haven. Brennan testified that, as an umpire, he possesses specialized knowledge about softball and softball rules that is greater than the average person's knowledge. Both Brennan and Shepard were familiar with the association's rules governing the conduct of umpires.

Brennan and Shepard testified that when they observed unsportsmanlike conduct, they would issue a warning and, if the warning was disregarded, they would eject the player from the game. Specifically, they testified that they would have taken such action if they had observed the disruptive behavior described by several witnesses, including taunting, loud swearing, kicking a garbage can, hitting the inside of the dugout with a bat, or throwing a glove from the pitcher's mound into the dugout.

Brennan and Shepard further testified that when they give a warning, it usually has the effect of stopping the disruptive behavior and preventing future improper acts. They testified that any player who tosses a bat should be ejected immediately, and Brennan testified that if he had seen a player toss a bat as described by the witnesses, he would have ejected that player without warning. They testified that such disciplinary action is an effective means by which to control the actions of players.

Shepard testified that, as an umpire, he had the duty to maintain control of the game to prevent harm to spectators, and that warnings constitute the primary means by which to maintain that control. Moreover,

Brennan testified that umpires have the authority to suspend the game if necessary to keep order or to prevent harm to spectators.

Brennan and Shepard also testified that the decision of whether to impose discipline in any given instance of unruly behavior is a discretionary matter for the umpire. Brennan testified that the rule against unsportsmanlike conduct gives the umpire authority "at his discretion, to disqualify any player who exhibits unsportsmanlike conduct in the judgment of the umpire." He further testified that decisions whether to take disciplinary action in response to loud swearing, throwing a glove or kicking dirt "are umpire judgment or umpire discretion calls." Shepard testified that the question of whether unruly behavior, such as using loud and abusive language, throwing a glove or kicking a garbage can, constitutes unsportsmanlike conduct will depend on the particular situation. Shepard further testified that the determination of whether unsportsmanlike conduct has occurred sometimes depends upon "the whole tenor of what is going on, the language, plus the gloves, plus whether it's considered taunting or not." Similarly, Brennan testified that "[t]here are a lot of variables that go into" determining whether unsportsmanlike conduct has occurred. Brennan further testified concerning the subjective nature of the decision whether to discipline a player for unsportsmanlike conduct. Specifically, he stated that "the majority of the time you'll find that umpires are former players, and umpires will use the term unsportsmanlike conduct as some type of action which, had I been a player, I wouldn't like done to me, I wouldn't let another group do it to another player."

We note that this testimony confirms what is the common understanding of the umpire's task. In the absence of exceptional circumstances, a softball umpire, when confronted with unruly behavior by a

player that arguably constitutes unsportsmanlike conduct, faces a spectrum of discretionary options. At one end of the spectrum is taking no action; at the other end is ejection of the player or suspension of the game. In between are warnings and other appropriate disciplinary action. The umpire has discretion, within the spectrum, to respond to the offensive behavior in the manner that the umpire finds to be most appropriate in the given circumstances.

The trial court directed a verdict in favor of Brennan and Shepard reasoning, in part, that if a duty exists, expert testimony was required to establish a breach of that duty and that such a breach caused the harm to the plaintiffs. The trial court concluded further that the standard of care applicable to an umpire, whether that standard was breached, and whether that breach caused the plaintiffs' injuries are not matters of common knowledge. We conclude that the plaintiffs were required to establish by expert testimony that the failure of Brennan and Shepard to act in the present case constituted a breach of duty, and that the plaintiffs' evidence did not satisfy that burden.

"A breach of duty by the defendant and a causal connection between the defendant's breach of duty and the resulting harm to the plaintiff are essential elements of a cause of action in negligence." *Catz* v. *Rubenstein*, 201 Conn. 39, 44, 513 A.2d 98 (1986); see *RK Constructors, Inc.* v. *Fusco Corp.*, 231 Conn. 381, 384, 650 A.2d 153 (1994) ("essential elements of a cause of action in negligence are well established: duty; breach of that duty; causation; and actual injury"). A motion for a directed verdict is properly granted if the jury could not reasonably and legally have found that the plaintiff had proved each of these elements. "A directed verdict is justified if . . . the evidence is so weak that it would be proper for the court to set aside a verdict rendered

for the other party." (Citations omitted.) *Boehm* v. *Kish*, 201 Conn. 385, 389, 517 A.2d 624 (1986).

"The existence of a duty is a question of law and [o]nly if such a duty is found to exist does the trier of fact then determine whether the defendant violated that duty in the particular situation at hand. *Petriello* v. *Kalman*, 215 Conn. 377, 382–83, 576 A.2d 474 (1990). If a court determines, as a matter of law, that a defendant owes no duty to a plaintiff, the plaintiff cannot recover in negligence from the defendant." (Internal quotation marks omitted.) *RK Constructors, Inc.* v. *Fusco Corp.*, supra, 231 Conn. 384–85.

If the determination of the standard of care requires knowledge that is beyond the experience of an ordinary fact finder, expert testimony will be required. *Jaffe* v. *State Dept. of Health*, 135 Conn. 339, 349, 64 A.2d 330 (1949); *Sickmund* v. *Connecticut Co.*, 122 Conn. 375, 379, 189 A. 876 (1937); *Slimak* v. *Foster*, 106 Conn. 366, 368, 138 A. 153 (1927); *Matyas* v. *Minck*, 37 Conn. App. 321, 326, 655 A.2d 1155 (1995); see *State* v. *McClary*, 207 Conn. 233, 245, 541 A.2d 96 (1988) (expert testimony required in criminal case because nature and cause of victim's injuries "manifestly beyond the ken of the average trier of fact, be it judge or jury").

We note that the plaintiffs' claims in the present case are akin to allegations of professional negligence or malpractice, which we have previously defined as "the failure of one rendering professional services to exercise that degree of skill and learning commonly applied under all the circumstances in the community by the average prudent reputable member of the profession with the result of injury, loss, or damage to the recipient of those services." (Internal quotation marks omitted.) *Davis* v. *Margolis*, 215 Conn. 408, 415, 576 A.2d 489 (1990). As Brennan testified, he possesses specialized knowledge as an umpire that is greater than the average

person's knowledge. An umpire obtains, through formal training and experience, a familiarity with the rules of the sport, a technical expertise in their application, and an understanding of the likely consequences of officiating decisions. As a result, the umpire possesses knowledge of the standard of care to which an umpire reasonably may be held, and of what constitutes a violation of that standard, that is beyond the experience and ken of the ordinary fact finder. Moreover, the fact finder's lack of expertise is exacerbated by the highly discretionary nature of the umpire's task. Thus, the fact finder must determine not just whether in hindsight the umpire erred, but also whether the umpire's error constituted an abuse of his broad discretion. In such cases in which the fact finder's decision requires specialized knowledge, expert testimony is necessary "to assist lay people, such as members of the jury and the presiding judge, to understand the applicable standard of care and to evaluate the defendant's actions in light of that standard." Id., 416; see, e.g., *Barrett* v. *Danbury Hospital*, 232 Conn. 242, 252, 654 A.2d 748 (1995) (medical malpractice); *Davis* v. *Margolis*, supra, 416 (legal malpractice); *Matyas* v. *Minck*, supra, 37 Conn. App. 327 (negligence of engineer).

In the present case, the plaintiffs do not articulate clearly the umpire's duty upon which they base their claim. The plaintiffs principally rely upon the testimony of Shepard that an umpire's duty is "to maintain control on the field so it does not spill over to spectators."[15]

---

[15] The plaintiffs also rely upon the answer by Brennan and Shepard to the complaint in which they admitted that their "duties at the game at which [Santopietro, Jr.] was injured included *preventing disruptive and dangerous behavior*, such as throwing of baseball bats." (Emphasis added.) We are not bound, however, by this pleading admission or their testimony concerning their duty to maintain control of the game for two reasons. First, the determination of whether a duty exists to support tort liability is a question of law to be decided by the court. *RK Constructors, Inc.* v. *Fusco Corp.*, supra, 231 Conn. 384–85. Second, umpires cannot, as a matter of law, possibly bear such a duty, taken literally, as this concession suggests, namely, to

Thus, the plaintiffs appear to postulate a duty owed by the umpires to maintain control of the game in such a way as to prevent harm to others. On appeal, Brennan and Shepard do not concede that such a duty exists, but argue that even if we were to assume its existence, the plaintiffs failed to define the duty. Our research indicates that no other jurisdiction has explicitly considered whether to impose or how to define such a legal duty.[16]

Therefore, for the purposes of this appeal, we assume, without deciding, that umpires such as Brennan and Shepard[17] have a duty, essentially as postulated

*prevent altogether* the occurrence of disruptive and dangerous behavior. The umpires' duty, if it exists, cannot exceed the requirement to take reasonable measures to deter the occurrence of such behavior.

[16] See *Bain* v. *Gillispie*, 357 N.W.2d 47, 49 (Iowa App. 1984) (holding that no tort exists for "referee malpractice" where sports merchandisers sued basketball referee for negligent officiating that resulted in harm to their business interests); cf. *LeNoble* v. *Fort Lauderdale*, 663 So. 2d 1351, 1352 (Fla. App. 1995) (in negligence action by fast pitch softball pitcher struck by batted ball, summary judgment improper because evidence that umpires were responsible for enforcing rules and ensuring that distance from pitching rubber to home plate complied with association's rules, and that umpire was informed that pitching rubber was improperly placed, gave rise to issues of fact to be resolved before legal question of duty could be determined).

In one sports law treatise, the authors assert that such a duty does exist. "Sports officials have a duty to see that the rules for participant and spectator safety are obeyed. To the extent that the duty is not performed, they and their employers may be negligent. See, e.g., *Carabba* v. *Anacortes School District No. 103*, 72 Wash. 2d 939, 435 P.2d 936 (1967) (liability may be imposed upon school district for referee's negligence in failing to detect an illegal wrestling hold that left a high school athlete permanently paralyzed). . . . An official's responsibility goes much further than enforcement of rules. Officials control the competition, and in this capacity are saddled with a general duty of care." G. Schubert, R. Smith & J. Trentadue, Sports Law (1986) § 7.5.

[17] We note that Brennan and Shepard had been formally trained and were paid to officiate the game at which Santopietro, Jr., was injured. Although this information does not affect the resolution of the present case, we acknowledge that it may be relevant if, in the future, we are required to decide whether such a duty exists. The existence or extent of a duty might be affected by whether the umpire is a paid professional or an unpaid volunteer without formal training.

by the plaintiffs, to exercise reasonable judgment as umpires in order to maintain control of a game so as to prevent an unreasonable risk of injury to others. The breach of this duty, however, must be proved, in the absence of exceptional circumstances, by expert testimony establishing that the allegedly negligent action or failure to act by the umpire constituted an abuse of the umpire's discretion to evaluate the particular circumstances and to take only such disciplinary action as the umpire deems appropriate. Moreover, the expert testimony must establish an abuse of that discretion sufficient to permit a jury to infer that the umpire's action or failure to act constituted such a loss of control of the game as to give rise to an unreasonable risk of injury to the plaintiff.

In fact, in the present case, the plaintiffs concede that expert testimony was required to establish whether the applicable standard of care was breached by Brennan and Shepard. The plaintiffs argue that, through the testimony of Brennan and Shepard, they presented sufficient positive evidence of an expert nature from which the jury could have reasonably concluded that Brennan and Shepard were negligent.

We have previously held that the plaintiff in a medical malpractice action may prove the proper standard of care and its breach through the testimony of the defendant. *Console* v. *Nickou*, 156 Conn. 268, 273–74, 240 A.2d 895 (1968); *Snyder* v. *Pantaleo*, 143 Conn. 290, 294–95, 122 A.2d 21 (1956). Similarly, in the present case, the record reveals that the testimony of Brennan and Shepard constituted expert testimony through which the plaintiffs might have established negligence. Moreover, Brennan and Shepard, as expert witnesses, were not required specifically to have expressed an opinion that they breached the standard of care in order for the plaintiffs to prevail. *Console* v. *Nickou*, supra, 273–75; *Snyder* v. *Pantaleo*, supra, 294–95. Rather, the plaintiffs

need only have produced sufficient expert testimony to permit the jury reasonably to infer, on the basis of its findings of fact, that Brennan and Shepard breached the standard of care.

For example, in *Console* v. *Nickou*, supra, 156 Conn. 273, the defendant physician testified that the applicable standard of care would be breached if a physician left a needle in a patient's body after surgery. Although the physician did not testify that he breached the standard of care, we concluded that his testimony, when applied to the facts of the case, was sufficient to permit the jury reasonably to conclude that the standard of care had been breached. Id., 273–75; see also *Snyder* v. *Pantaleo*, supra, 143 Conn. 294–95 (although plaintiff patient presented no expert opinion that defendant physician was negligent, jury could have found that facts established breach of duty on basis of physician's testimony concerning proper standard of care).

We conclude, in the present case, that the plaintiffs failed to produce sufficient evidence that Brennan and Shepard had breached the applicable standard of care. Brennan and Shepard testified that unsportsmanlike conduct is prohibited and that it is appropriate for an umpire to take action to prevent or stop such conduct. They further testified that the umpire possesses the authority to warn players, eject them or suspend the game if necessary to deter unsportsmanlike conduct or to maintain control of a game. Moreover, when questioned about specific incidents that allegedly had occurred during the game at which Santopietro, Jr., was injured, Brennan and Shepard testified that if they had seen the incidents described by the witnesses, they would have taken some disciplinary action. They also testified, however, that the umpire possesses discretion in the application of the rule prohibiting unsportsmanlike conduct and that the decision whether to take some action against a player is made according to the judg-

ment of the umpire based on the specific circumstances. Neither Brennan nor Shepard testified that, in the specific circumstances of that game, a reasonable umpire would have been required to take action in response to those incidents, or that it would have been unreasonable for an umpire not to have taken such action. In other words, their testimony that, in the exercise of their discretion, they would have taken action does not establish that a failure to act constituted a breach of the standard of care.

The plaintiffs did present evidence that, arguably, would support the conclusion that Brennan and Shepard improperly failed to act in response to two incidents. First, witnesses testified that a player tossed a bat toward other bats after an unsuccessful plate appearance. Brennan and Shepard testified that the local rule required them to eject immediately any player who throws a bat. Brennan further testified that the incident described by the witnesses would "merit an ejection." If we were to interpret this testimony to constitute an expert opinion that a reasonable umpire must have ejected the player in those circumstances, then this evidence would support the conclusion that Brennan and Shepard improperly failed to act with respect to that particular incident. Second, a witness testified that some players taunted members of the other team. Shepard testified that an umpire should take immediate action in response to taunting. Brennan and Shepard do not dispute the plaintiffs' evidence that they did not take any disciplinary action during the game.

The testimony of Brennan and Shepard concerning these two incidents supports a possible conclusion that they failed to exercise their discretion in a reasonable manner on two occasions during the game. The plaintiffs do not contend, however, that these two incidents suffice to establish that Brennan and Shepard breached a duty, which we assume exists, to maintain control of

the game in order to prevent unreasonable risk of harm to others. The plaintiffs do not argue, and we do not assume, that Brennan and Shepard possess a duty to make every discretionary call that arises during the course of the game error free. Umpire liability, if it were to exist, must be predicated on facts sufficient to support the conclusion that their unreasonable actions or failure to act led to such a loss of control of the game as to imperil unreasonably the safety of others. We conclude, as a matter of law, that these two incidents of arguably negligent behavior are not sufficient to support such a conclusion.

We conclude, therefore, that the plaintiffs have failed to prove by expert testimony that Brennan and Shepard breached a duty of care to prevent an unreasonable risk of the injuries suffered by Santopietro, Jr. Because the jury could not have reasonably and legally concluded that the plaintiffs had established the elements of a negligence cause of action, a directed verdict was properly granted.

### III

As a result of our conclusion that the plaintiffs did not establish negligence on the part of Brennan and Shepard, we do not reach the claim of Santopietro, Sr., that the trial court improperly precluded his claim for bystander emotional distress.[18] We note, however, that we recently decided in *Clohessy* v. *Bachelor*, 237 Conn. 31, 675 A.2d 852 (1996), that a cause of action for bystander emotional distress may arise under certain circumstances.

The judgment is affirmed.

In this opinion the other justices concurred.

---

[18] As the plaintiffs' appeal papers indicate, and as the plaintiffs acknowledged at oral argument, Santopietro, Sr., does not pursue on appeal his claim against Piombino for bystander emotional distress. See footnote 4.