******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

J. WM. FOLEY, INC. *v.* THE UNITED
ILLUMINATING COMPANY
(AC 36194)

Gruendel, Mullins and Mihalakos, Js.

*Argued November 19, 2014—officially released June 23, 2015*

(Appeal from Superior Court, judicial district of
Hartford, Complex Litigation Docket, Bright, J.)

*Ira S. Sacks*, with whom were *Gerard P. Brady*, and,
on the brief, *Alan J. Sobol* and *Paul G. Ryan*, for the
appellant (plaintiff).

*Jonathan M. Freiman,* with whom were *Timothy A. Diemand* and *Ivana D. Greco,* for the appellee (defendant).

*Opinion*

MULLINS, J. The plaintiff, J. Wm. Foley, Inc. (Foley), appeals from the judgment of the trial court, after a bench trial, rendered in part in favor of the defendant, The United Illuminating Company (United). Foley claims that the court improperly: (1) denied its claim for compensation arising from delays in a construction project in which Foley served as a contractor; (2) concluded that it was not entitled to a 10 percent markup on United's settlement payments to Foley's subcontractors pursuant to a markup provision in the parties' contract; (3) denied its claims for interest; (4) rejected its tort claims; and (5) denied its request for leave to file a fifth amended complaint. We affirm the judgment of the trial court.

The relevant facts found by the court in its memorandum of decision are as follows. To meet the growing energy demands of southwest Connecticut, United undertook the construction of a sixty-nine mile power transmission line. As a part of that endeavor, United was required to install an underground power transmission line over a six mile stretch of land between Bridgeport and Stratford (project). "Doing so was not simply a matter of digging a single six mile trench through open land, laying a six mile transmission line in the trench, and then filling it in. [United's] route passed through congested residential and commercial areas, and included work on public roads. In addition, to protect the transmission line, concrete would be poured into the trench to encase the line in a 'duct bank.' Finally, the transmission line would be laid in segments and connected to other segments along the length of the duct banks. These connection points are known as splice chambers. . . .

"To complete the work required on the project, [United] sought bids from qualified contractors who would be responsible for digging the trenches, laying the transmission line, installing the duct banks and splice chambers, laying the transmission line into the splice chambers and filling in the trenches. On or about January 25, 2006, Foley submitted a bid of $43,344,000 to do all of this work, except for supplying and installing the transmission line. . . .

"In submitting this bid, Foley considered the drawings [United] gave to potential bidders as part of the bid package. These drawings showed various obstructions a contractor should expect to encounter when doing the trenching and laying work called for by the bid request. Among these obstructions were other utilities already in the area where the work was to be performed. [United] notified Foley that it was the low bidder on the contract, and Foley and [United] then began negotiating the terms of a contract."

On or about September 29, 2006, United and Foley

entered into a contract for Foley's work on the project (contract). The contract reflected an understanding by the parties that Foley could encounter site conditions not identified in the drawings. Specifically, the contract provided that "in the event that [Foley] encounters unknown or misidentified site conditions whose presence will cause a change in [Foley's] scope of work or delay in the critical path" Foley would be entitled to additional compensation. "Critical path" was defined in the contract as "the particular sequence of tasks, activities, and/or other [m]ilestones associated with performance of the [w]ork which must be accomplished as scheduled in order for the [w]ork and the [p]roject as a whole to be completed on time and in accordance with the [c]ontract [d]ocuments, including the [p]roject [s]chedule."[1] The contract included a lump sum contract price of $53,348,057.

Article 6 of the contract outlined a mechanism for compensating Foley for the expenses that it incurred from unexpected obstacles. When Foley sought additional compensation, § 6.4 (a) required that Foley submit to United a "[c]hange [o]rder" request. The change order request had to include "an equitable schedule and/or price adjustment to compensate [Foley] for the actual, demonstrable delay in the [c]ritical [p]ath and/or the cost of [Foley's] additional [w]ork." Section 6.1 (d) provided that claims for additional compensation would be "irrevocably waived and released" unless Foley submitted its change order request within ten business days of the event or decision giving rise to the claim (ten day rule). "Pursuant to § 6.1 (e), [United] then had ten business days to respond to Foley's proposal. . . . Pursuant to § 6.3, if [United] agreed with the proposal, a change order would issue. . . . Thus, based on the structure of the agreement, the parties . . . intended that any price adjustments related to delay were to be resolved as part of the above process and addressed on a change order by change order basis."

United hired Black & Veatch to serve as its consultant on, and coordinator of, the project.[2] Foley hired as subcontractors Manafort Brothers, Inc. (Manafort) and A.M. Rizzo Electrical Contractors, Inc. (Rizzo). Manafort dug the trenches and installed the duct banks and splice chambers. Rizzo installed the piping in the trenches that would include the transmission line. After Rizzo installed the piping, Manafort then refilled the trenches.

According to their anticipated schedule, the parties expected the project to take approximately one year to complete. Foley was to commence construction in October, 2006, and have construction substantially completed[3] by November, 2007. Foley did not notify United that the project was substantially complete, however, until November, 2008, approximately one year after the

expected completion date.

There were many reasons for delays to the project. On the one hand, United was responsible for some of those reasons, which included: failing to secure necessary easements; postponing work on the project due to the construction of a separate transmission line; tardily remediating soil contamination; and failing to resolve a municipal zoning dispute in a timely manner. On the other hand, various performance and workmanship issues by Foley and its subcontractors also slowed the project. For example, Manafort's use of trench boxes that were ill suited for the densely populated urban conditions encountered during construction caused delays to the project.

"By far though, the biggest obstacles the parties encountered on the project were unknown underground utilities and other conditions [that] were not shown on the project drawings. Foley and Manafort started encountering these obstacles as early as January, 2007. They continued to encounter them throughout virtually the entire project. The unknown conditions encountered included everything from abandoned water pipes ranging in size up to 60 inches in diameter located in positions different than what was shown on the project drawings; gas lines and other underground utilities not shown on the drawings at all; unexpected amounts of rock; a culvert that was missing one side that everyone thought was there; and soil contaminated by PCBs.[4] Overall, while the number of expected underground interferences shown in the project drawings was 415, over the life of the project Foley and Manafort encountered 1209." (Footnote added.)

Almost immediately after construction began, Foley encountered undisclosed obstacles and, pursuant to § 6.4 (a) of the contract, requested additional compensation for the resulting costs by submitting to United change order requests. "By the summer of 2007 though, Foley and [United] were in dispute over what level of detail needed to be provided in the [change order requests]. Given the number of obstacles and issues it was encountering, Foley thought that it was impractical for it to identify the critical path impact associated with each submittal it made. Consequently, it proposed [to United] that the parties resolve the direct cost part of the [change order requests] when presented and reserve for later any resolution of critical path impact."

In particular, on July 23, 2007, Foley proposed altering the procedures set forth in § 6.4 (a), whereby Foley would be permitted to include in its change order requests only the direct costs associated with an obstacle, while reserving to the parties "all rights, remedies and defenses" concerning critical path delays. On August 3, 2007, however, United declined that proposal, and informed Foley that claims for additional compensation must comply with article 6 of the contract. Upon

receipt of United's refusal, Foley reiterated to Manafort that change order requests must include "a cost and resource loaded schedule showing impact to the critical path," that "[a]ll claims must have all of the information shown in Article 6," and that "the time limitations outlined in Article 6 are in effect."

On August 15, 2007, Manafort informed Foley that it believed that United's requirements were impractical, and inquired whether, after submitting change order requests, it should continue work or halt construction until United issued a change order. On August 20, 2007, Foley replied: "[United] *is not* waiving the time limits for submitting a claim as contained in the [c]ontract, Article 6. . . . Please also be reminded that requests for adjustments to the critical path schedule affecting your subcontract work must be received in time for Foley to make any necessary adjustments to the overall critical path schedule and submit its proposal to [United] for such change in the work." (Emphasis in original.) That same day, Foley forwarded Manafort's inquiry to United, and submitted another proposal to adjust the change order process. Foley suggested that United issue change orders in two parts: the first part would pertain to increased direct costs; the second part would address adjustments for delays in the critical path.

In a letter dated August 28, 2007 (August, 2007 letter), United represented to Foley that it would modify the change order process, but in a manner different from what Foley had proposed. Under the adjusted procedure, United first would negotiate the direct costs associated with the obstacle, and then United and Foley would negotiate "the number of days delay to the crew . . . ." United clarified, however, that this modification pertained only to crew delays, and not critical path delays.[5]

Specifically, United explained: "When the negotiations are complete, a change order will be drafted in the agreed dollar amount (Direct Costs). The change order will also list the agreed amount of crew-day delay; *not schedule delay*. The idea is to keep the crew delays with the appropriate change order event. *The listing of the crew-day delay will not signify that* [*United*] *has waived any provision of the contract. A day of delay to a particular crew shall not be understood as being equal to a day of delay of the project schedule* [a critical path delay]. These change orders will not affect either party's rights or liabilities for delay and impact costs, except that the change order will have settled the issue of how many days delay was experienced by the impacted crew only." (Emphasis added.)

As construction progressed, Foley continued to encounter unanticipated obstacles and, in turn, submitted to United change order requests for direct costs and crew delays. United continued to issue change

orders that provided additional compensation to Foley.[6] In spite of that, however, "Foley never, during the course of the project, submitted a critical path delay analysis or claim with any [change order request]. While it did regularly submit updates to critical path schedules . . . those schedules did not assign responsibility for any particular delay to any particular event or party."

On October 10, 2008, as work on the project was in its final stages, Foley, for the first time, submitted to United a claim for a delay of the project, a critical path delay. This claim, however, did not include a critical path delay analysis. In its submission, "Foley basically claimed that the project took thirteen months longer than expected, the entire delay was [United's] fault, and, as a result, Foley had additional overhead and related costs of $6,174,122.45 for which [United] was responsible. . . . While Foley attached documents in support of its claimed increased costs, it did not submit a critical path delay analysis with its claim."

United refused to compensate Foley for the delay claim. Thereafter, Foley filed the present action seeking, inter alia, compensation for "delays in the critical path caused by unknown or misidentified site conditions, and caused by the extra, additional, and impacted work ordered, directed, or otherwise required on the project."[7]

In 2011, Foley submitted to United two additional versions of its delay claim, neither of which included a critical path delay analysis. Again, "Foley had taken a 'global cost approach' to the claim. . . . Essentially, Foley was claiming that all delays on the project were clearly [United's] responsibility and it had to prove nothing more than the amount of costs it incurred because the project took longer to complete than planned."

In June, 2012, Foley, for the first time, presented United with a time impact analysis pertaining to delays in the critical path. This analysis was prepared by Riverso Associates, Foley's scheduling consultant during the project. In connection with this report, "[o]n August 10, 2012, approximately one month before the start of trial, Foley submitted a fourth version of its [delay] claim to [United]. The amount of this claim was $4,854,206.93." During trial, however, Foley's primary witness on damages acknowledged errors in Foley's delay claim, and Foley reduced the amount that it was claiming to $4,691,882.44.

On September 3, 2013, after a bench trial, the court, *Bright, J.*, issued a memorandum of decision. The court concluded that Foley had "irrevocably waived and released" its delay claim because it had failed to timely submit its claim to United. The court further concluded that, even if notice had been timely, Foley did not demonstrate that the delays for which United allegedly was responsible delayed the critical path of the project.

Accordingly, the court rendered judgment in favor of United on the breach of contract count regarding the delay claim.

The court, additionally, rejected Foley's tort claims, the breach of the implied covenant of good faith and fair dealing claim, and its claim that United violated the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq. The court also denied Foley's claim to recoup 10 percent of the settlement payments made by United to Foley's subcontractors, and rejected Foley's claim for unanticipated legal costs. The court found in Foley's favor, however, on three change order requests for additional direct costs that Foley claimed United wrongfully had rejected, and awarded Foley $1,051,143.30. The court, nonetheless, rejected Foley's claim for statutory interest on all amounts unpaid by United.[8] This appeal followed.

Additional facts and procedural history will be set forth as necessary.

## I

### DELAY CLAIM

Foley first claims that the court improperly denied its delay claim. Specifically, Foley contends that the court incorrectly determined that: (A) the ten day rule in the contract applied to critical path delay claims; and (B) Foley did not timely submit its critical path delay claim to United and, therefore, irrevocably waived and released its delay claim.[9] We are not persuaded.

Initially, we set forth our standard of review. Foley's delay claim sounds in breach of contract. "It is well settled that in order to recover for breach of contract, a plaintiff must prove that he or she sustained damages as a direct and proximate result of the defendant's breach." *Warning Lights & Scaffold Service, Inc.* v. *O & G Industries, Inc.*, 102 Conn. App. 267, 271, 925 A.2d 359 (2007). "[W]hether there was a breach of contract is ordinarily a question of fact. . . . Our review, therefore, is under the clearly erroneous standard." (Internal quotation marks omitted.) *Smithfield Associates, LLC* v. *Tolland Bank*, 86 Conn. App. 14, 21, 860 A.2d 738 (2004), cert. denied, 273 Conn. 901, 867 A.2d 839 (2005).

### A

### Applicability of Ten Day Rule

First, Foley claims that the ten day rule did not apply to the delay claim. We are not persuaded.

Foley's claim requires us to construe the meaning of the contract. In construing a contract, "[t]he contract must be viewed in its entirety, with each provision read in light of the other provisions . . . and every provision must be given effect if it is possible to do so." (Citation omitted.) *United Illuminating Co.* v. *Wisvest-Connecti-*

*cut, LLC*, 259 Conn. 665, 671, 791 A.2d 546 (2002). "Although ordinarily the question of contract interpretation, being a question of the parties' intent, is a question of fact . . . [when, like here] there is definitive contract language, the determination of what the parties intended by their . . . commitments is a question of law [over which our review is plenary]." (Citation omitted; internal quotation marks omitted.) *Bristol* v. *Ocean State Job Lot Stores of Connecticut, Inc.*, 284 Conn. 1, 7, 931 A.2d 837 (2007).

Here, reading the contract provisions as a whole and in light of each other, as we must, the language of the contract unambiguously demonstrates that critical path delay claims are subject to the ten day rule. Indeed, § 6.4 (a) of the contract provided that United would compensate Foley for "the actual, demonstrable delay in the [c]ritical [p]ath." In order to be entitled to that compensation, however, the contract specifically provided that, after encountering unknown or misidentified site conditions, Foley had ten business days within which to submit a claim for compensation arising from delays in the critical path, or that claim would "be irrevocably waived and released . . . ." The ten day notice requirement pertained to "[a]ny [c]laims by [Foley] for increased compensation or extension of completion deadlines . . . ." Critically, § 6.4 (b) provided that the "[d]iscovery of unknown or misidentified site conditions shall not relieve [Foley] of any of its obligations under this [a]greement."

Consequently, it is clear that the language of the contract provided that the ten day notice rule applied to *any* claims for which Foley sought additional compensation as a result of the extension of completion deadlines. This obviously encompassed both unknown or misidentified site conditions as well as anything else that Foley believed caused a demonstrable delay in the critical path and impacted the completion date of the project.[10] Thus, the court correctly determined that Foley's delay claim was subject to the ten day rule.

Given that we have determined that the court properly applied the ten day rule to the delay claim, it is evident that Foley did not timely submit its claim for compensation arising from delays in the critical path. Indeed, the court determined that Foley failed to submit a critical path delay claim that included an analysis identifying the impact of individual delays on the project's final completion date until June, 2012, when it submitted an analysis prepared by Riverso Associates. This submission was more than three and one-half years after construction had been completed. Thus, the court properly concluded that Foley's untimely "claim for delay damages [was] irrevocably waived and released."

B

Waiver of Ten Day Rule

Next, Foley claims that, even if the ten day rule did apply to the delay claim, it had submitted a valid delay claim because United waived its right to receive notice within ten days. Specifically, Foley argues that United relinquished its right to notice under the ten day rule because United's August, 2007 letter was tantamount to a waiver of that notice provision. We reject this claim because the record demonstrates, consistent with the court's conclusion, that United "never waived the notice requirements of article 6 as they relate to damages resulting from delays to the critical path."

"Waiver involves an intentional relinquishment of a known right. . . . There cannot be a finding of waiver unless the party has both knowledge of the existence of the right and intention to relinquish it. . . . Waiver may be inferred from the circumstances if it is reasonable so to do. . . . Whether conduct constitutes a waiver is a question of fact. . . . The issue of waiver is a question of fact, dependent on all of the surrounding circumstances and the testimony of the parties. (Citation omitted; internal quotation marks omitted.) *Roy* v. *Metropolitan Property & Casualty Ins. Co.*, 98 Conn. App. 528, 532, 909 A.2d 980 (2006). Being a question of fact, a finding of waiver or lack thereof is subject to the clearly erroneous standard of review. See *Smithfield Associates, LLC* v. *Tolland Bank*, supra, 86 Conn. App. 21.

Foley's claim that United waived the ten day rule lacks merit. To support its claim that United waived the ten day rule, Foley relies on the August, 2007 letter written by United in response to a request by Foley that the ten day rule not apply to critical path delay claims. Foley claims that, in the letter, United agreed that, henceforth, Foley would not be required to include critical path delay claims in change order requests, but that Foley's rights would be reserved to submit critical path delay claims after the ten day notice period had elapsed. We disagree.

In its memorandum of decision, the court found the following: "[The] language [in the August, 2007 letter] in no way gave Foley the relief it was seeking from article 6 of the contract. To the contrary, it confirmed that [United] was, in fact, not waiving any provision of the contract. It also made clear that resolution of direct costs and crew delays had nothing to do with whether there was a delay in the critical path. Finally, it confirmed that the procedure outlined would not affect either party's rights for delay and impact costs. Any rights Foley had to such costs were predicated on it meeting its obligations under the contract. Similarly, [United] retained the rights it had regarding such delay claims, including to a timely submittal." The court's conclusions are supported by the record.

In the August, 2007 letter, United agreed to a proce-

dure for issuing change orders that would compensate Foley for direct costs and crew delays. The letter clarified, however, that crew delays were distinct from critical path delays, and that United did not forfeit any contractual right, including the right to timely notice of delay claims. Specifically, the letter provided: "The listing of the crew-day delay will not signify that [United] has waived any provision of the contract. A day of delay to a particular crew shall not be understood as being equal to a day of delay to the project schedule."[11] This language demonstrates that, although United agreed to modify the process by which it issued change orders arising from crew delays, that modification would not affect the way United processed critical path delay claims. Indeed, United specified in the letter that crew delays were different from critical path delays, and that its contractual rights were reserved regarding critical path delays. Therefore, our review of the August, 2007 letter reveals that its language supported the court's conclusion that United did not waive the ten day rule.[12]

The court's determination that United did not waive the ten day rule is buttressed further by the conduct of United and Foley in the months following the August, 2007 letter. In response to a request by Foley for additional compensation, United submitted a letter to Foley, dated November 27, 2007, reiterating its expectation that critical path delay claims would be submitted with change order requests. In that letter, United wrote: "We acknowledge that Foley has made a number of requests to have [United] recognize the impact to various crews as a result of differing site conditions, but *Foley has never submitted a Change Proposal that includes an impacted critical path as called for by the* [contract]." (Emphasis added.)

Foley, likewise, demonstrated that it understood that United did not waive the ten day rule. In a letter that it submitted to Manafort, dated December 10, 2007, Foley demanded that its subcontractor "immediately produce an impacted schedule showing which delays and impacts you now believe are the responsibility of [United], Foley, or [Rizzo]" so that Foley could make a claim on Manafort's behalf.

Additionally, Foley insisted that, in providing that information to Foley, Manafort "carefully review Article 11 of the [subcontract between Foley and Manafort] entitled 'Delays.'" Article 11 of the subcontract provided in relevant part that Foley would forward to United "reasonable claims as may be prepared by [Manafort] in accordance with the terms of the [contract] with respect to the delays . . . ." Foley, thus, demanded that Manafort provide a critical path delay claim to comply with article 6 of Foley's contract with United. The language in the August, 2007 letter and the subsequent conduct of the parties, thus, supports the

court's conclusions that United did not waive the ten day rule, and that Foley "irrevocably waived and released" its untimely submitted delay claim.[13]

## II

### 10 PERCENT MARKUP

Next, Foley claims that the court improperly concluded that it was not entitled to a 10 percent markup on settlement payments that United made to Foley's subcontractors pursuant to a markup provision of the contract. Foley argues that the court's determination is at odds with the plain language of the contract.[14] We disagree.

The following facts and procedural history are relevant to this claim. The trial court found that "provisions in the Manafort and Rizzo subcontracts allowed them to be compensated for changed conditions by following the procedures outlined in article 6 of the contract." Thus, after encountering unexpected conditions that allegedly delayed or increased the scope of their work, pursuant to the subcontract, Manafort and Rizzo submitted change order requests to Foley. Foley forwarded the requests to United. "Under [Foley's contract with United] Foley was entitled to charge a 10 percent markup on change order requests submitted by Manafort and Rizzo." Specifically, the bid proposal that Foley submitted to United (markup agreement) provided for a 10 percent markup "[i]f [c]ost [p]lus work is encountered on this project that requires materials, equipment and subcontractors not shown in [the bid proposal's] schedules . . . ." "Foley regularly, although not always," submitted to United requests for those markups.

After the project was completed, Manafort and Rizzo, respectively, filed legal actions against United and Foley, in which they sought unreimbursed construction expenses. Their claims were not limited, however, to change order requests. They also alleged tort and CUTPA claims. "Thereafter, [United] mediated the subcontractors' claims directly with Manafort and Rizzo. Foley was invited to attend the mediation, but chose not to [attend]. [United] settled Manafort's claim for $9,675,000 and Rizzo's claim for $200,000."

At trial, Foley claimed that it was entitled to a 10 percent markup on the settlement payments pursuant to the markup agreement. The court determined, however, that "the [c]ontract [was] silent" on whether the markup encompassed the settlement payments. The court observed that "[p]arties often settle for a variety of reasons," and stated that it would "not attempt to divine the reasons behind [United's] decisions to pay Manafort and Rizzo what it did." The court noted that it was "clear . . . that the settlement was not an admission of liability." It concluded that "Foley [was] not entitled to a 10 percent markup." We discern no error in this

ruling.

The markup agreement provided that Foley was entitled to a markup of 10 percent for "[c]ost [p]lus work . . . that require[d] . . . subcontractors not shown in [the bid proposal's] schedules . . . ." There is no dispute that, pursuant to this provision, Foley was entitled to a markup on change order requests submitted by Manafort and Rizzo. This provision does not state that settlement payments also are encompassed within the markup agreement. "A term not expressly included will not be read into a contract unless it arises by necessary implication from the provisions of the instrument." *Texaco, Inc.* v. *Rogow*, 150 Conn. 401, 408, 190 A.2d 48 (1963). Indeed, the agreement included no language indicating that Foley was entitled to a markup on settlement payments. There is also nothing in the provisions of the contract that necessarily imply that Foley is entitled to a markup on settlement payments. We will not read such language into the contract.[15] Consequently, the record supports the court's determination that Foley was not entitled to a 10 percent markup on settlement payments that United made to Foley's subcontractors.

### III

### INTEREST PAYMENTS

Foley claims that the court's decisions to deny its claims for interest were improper. Specifically, Foley maintains that the court should have determined (1) that it was entitled to prejudgment interest (prejudgment interest claim), and (2) that it was entitled to interest on United's late payment of contract retainage (retainage interest claim). We disagree. Each claim will be addressed in turn.

### A

### Prejudgment Interest Claim

First, Foley contends that the court improperly rejected its claim for prejudgment interest pursuant to General Statutes § 37-3a.[16] We are not persuaded.

The following additional facts are relevant to our consideration of this claim. At trial, Foley sought "prejudgment interest pursuant to . . . § 37-3a on all amounts unpaid by [United]." The court denied that request. The court determined that, pursuant to articles 8 and 17 of the contract, United "had the right to dispute each of the issues on which it withheld payment." The court additionally observed that "on most issues, the court has agreed with [United]," and that, even on the issues in which it found in Foley's favor, "there was a good faith basis for [United's] position." Finally, the court determined that, "apparently to gain some perceived advantage in this litigation," Foley had refused United's offer of full payment to resolve a dispute on a particular change order to which United conceded Foley was entitled. The court, thus, stated that it would

not award Foley prejudgment interest because it was "difficult for the court to award a party interest when it engages in such gamesmanship."

Foley argues that "the court mischaracterized Foley's actions and failed to give proper weight to the evidence demonstrating [United's] wrongful conduct." We disagree.

"[T]he decision of whether to grant interest under § 37-3a is primarily an equitable determination and a matter lying within the discretion of the trial court. . . . In determining whether the trial court has abused its discretion, we must make every reasonable presumption in favor of the correctness of its action. . . . [T]he court's determination regarding the award of interest should be made in view of the demands of justice rather than through the application of any arbitrary rule. . . . Whether interest may be awarded depends on whether the money involved is payable . . . and [considerations such as] whether the detention of the money is or is not wrongful under the circumstances." (Citation omitted; internal quotation marks omitted.) *MedValUSA Health Programs, Inc.* v. *MemberWorks, Inc.*, 273 Conn. 634, 666, 872 A.2d 423, cert. denied sub nom. *Vertrue, Inc.* v. *MedValUSA Health Programs, Inc.*, 546 U.S. 960, 126 S. Ct. 479, 163 L. Ed. 2d 263 (2005); see also *DiLieto* v. *County Obstetrics & Gynecology Group, P.C.*, 310 Conn. 38, 53–54 n.13, 74 A.3d 1212 (2013).

In the present case, the court's conclusion that United had a contractual and good faith basis to oppose Foley's claims and withhold payment was supported by the record. Articles 8 and 17 of the contract provided United the right to dispute claims for compensation made by Foley. Moreover, Foley does not dispute that United fulfilled hundreds of its requests for compensation for direct costs during the course of the project. As the court found, during construction "Foley submitted 492 [change order requests], which resulted in 294 change orders being issued."[17] Indeed, the court observed that "of the [change order requests] submitted, only twelve that seek additional direct costs were at issue by the time this case went to trial."[18]

At trial, United prevailed on the majority of the disputes upon which Foley alleged that United wrongfully withheld money. Although Foley now asserts that United, and not itself, actually was the party that partook in "gamesmanship" during the project and the subsequent litigation, such a factual determination is beyond the province of this court. See *Cadle Co.* v. *D'Addario*, 268 Conn. 441, 462, 844 A.2d 836 (2004) ("[i]t is within the province of the trial court, as the fact finder, to weigh the evidence presented and determine the credibility and effect to be given the evidence" [internal quotation marks omitted]).

The court relied on appropriate equitable considera-

tions that were within its discretion. The court's decision not to award prejudgment interest to Foley pursuant to § 37-3a, therefore, was not an abuse of discretion.

## B

### Retainage Interest Claim

Next, Foley claims that it is entitled to interest on the late payment of the contract retainage[19] pursuant to General Statutes § 42-158j.[20] Foley argues that it sought interest under that statute for the defendant's failure to pay timely the retainage, but that the court "failed to address this specific statute or render a decision on the merits." According to Foley, the court should have awarded it "statutory interest on the balance of retainage improperly withheld by [United] following substantial completion of the project." We are not persuaded.

The following facts and procedural history are relevant to this claim. On November 19, 2008, Foley notified United that the project was substantially complete. "While [United] initially agreed that substantial completion had occurred . . . [United] rescinded that confirmation and later took the position that substantial completion occurred on March 19, 2009. Despite this acknowledgment, [United] did not release any of the approximately $4,000,000 in retainage it was holding on the project until May 15, 2009, when it released $2,000,000. . . . The balance of the retainage was not paid until February 24, 2010." (Citations omitted.)

In its complaint, Foley alleged that United had violated CUTPA by directing Foley to undertake additional work while knowing that it did not have sufficient funds to pay Foley, and by failing to make timely payments of the amounts due, including interest, despite repeated requests under § 42-158j. The court rejected Foley's CUTPA claim. The court specifically found that there "was nothing deceptive or unfair in [United's] conduct during the project. The parties had a number of good faith disputes. On some, they reached agreement. On others, they did not. The evidence proved nothing more."[21] The court, however, did not refer to § 42-158j in its decision.

Foley first argues that the court failed to rule on its retainage interest claim. We disagree.

Our reading of the court's memorandum of decision indicates that, although it did not expressly identify the statute, the court's implicit denial of Foley's claim for interest under § 42-158j is clear. Foley presented this claim in its complaint, and in its posttrial brief, as one of the predicates for its CUTPA claim. The court rejected the CUTPA claim in its entirety. Additionally, the court made findings supporting a determination that the retainage in question was not an "amount due and owing" under the contract. See General Statutes § 42-

158j (c) (4). For example, in rejecting the prejudgment interest claim, the court found that, under the contract, the defendant "had the right to dispute each of the issues on which it withheld payment," and that it had acted in good faith.

Foley additionally contends that the court should have awarded it interest pursuant to § 42-158j. We are not convinced.

Under § 42-158j (c) (4), a court may award contractors statutory interest for "amount[s] due and owing." In the present case, however, the court concluded that "[u]nder [a]rticles 8 and 17 of the contract, [United] had the right to dispute each of the issues on which it withheld payment." Additionally, the court determined that, even on the issues in the litigation in which it found in favor of Foley, "there was a good faith basis for [United's] position." United's contractual right to dispute Foley's claims, as well as its good faith basis for doing so, supported the court's conclusion that United had not withheld an "amount due and owing" from Foley. Therefore, the court's decision not to award Foley prejudgment interest under § 42-158j was not an abuse of its discretion.

## IV

### ADDITIONAL CLAIMS

Foley claims that the court improperly rejected additional claims that it had pursued against United. Specifically, Foley contends that the court should have concluded that it established causes of action against United sounding in (1) negligence and (2) violations of CUTPA. We disagree. Each claim will be addressed in turn.

### A

#### Negligence

Foley contends that the court improperly rejected its negligence claim. The following facts are relevant to our resolution of this claim. Foley alleged in its complaint that United was negligent because it breached its duty of care to Foley by, inter alia, "provid[ing] defective, inadequate and incomplete plans" for the project, and "fail[ing] to determine and to make known to Foley the true nature of soil and subsurface conditions existing at the project site . . . ." The court rejected those claims.

The court determined that: "The parties rights and obligations are spelled out in the contract. There was no evidence presented by Foley, either fact or expert [testimony], that [United] owed some duty to Foley that did not arise out of the contract." The court further explained: "Foley offered no evidence defining the standard of care that applied to a party like [United] on a project such as this. Nor did it offer any evidence of how [United] breached this undefined standard of care." The

court also stated that Foley's negligence claim was undermined because, based on the industry standard, it was the contractor, Foley, and not the owner, United, that was the party responsible for conducting exploratory trenching, performing "pot holing," and identifying obstructions. The court concluded: "[T]he contract provided a remedy for Foley in the event it ran into unidentified obstructions or environmental issues. Given the existence of that remedy, the court fails to see how not identifying every condition Foley might encounter breached some unidentified standard of care."[22]

On appeal, Foley claims that the court should have concluded that United was negligent because (1) United failed to identify all underground utilities, and (2) United failed to perform soil testing and communicate the results to Foley. We disagree.

"The essential elements of a cause of action in negligence are well established: duty; breach of that duty; causation; and actual injury. . . . Contained within the first element, duty, there are two distinct considerations. . . . First, it is necessary to determine the existence of a duty, and then, if one is found, it is necessary to evaluate the scope of that duty." (Internal quotation marks omitted.) *Considine* v. *Waterbury*, 279 Conn. 830, 858–59, 905 A.2d 70 (2006).

"The issue of whether a duty exists is a question of law . . . which is subject to plenary review. We sometimes refer to the scope of that duty as the requisite standard of care." (Citations omitted.) *LePage* v. *Horne*, 262 Conn. 116, 123, 809 A.2d 505 (2002). "[O]nly if such a duty is found to exist does the trier of fact then determine whether the defendant violated that duty in the particular situation at hand. . . . Put another way, the question of what a reasonable person would have done under the circumstances is a question to be determined by the trier of fact, except where the individual's conduct clearly has or has not conformed to what the community requires, and that no reasonable [trier of fact] could reach a contrary conclusion." (Internal quotation marks omitted.) *Considine* v. *Waterbury*, supra, 279 Conn. 859.

1

Undisclosed Utilities

Foley argues that the court improperly rejected its negligence claim because it demonstrated that United breached its duty to disclose all underground utilities. To support its contention, Foley relies on a contract entered into between Black & Veatch and United, pursuant to which Black & Veatch was responsible for "locating all [underground] utilities in the proposed route." Based on that contract's language, Foley claims that "[United] had a duty to fulfill its contractual obligations with the degree of care which a public utility provider

of ordinary prudence would have exercised under the same or similar conditions," and that it breached that duty by failing to disclose to Foley all underground utilities. We are not persuaded.

At the outset, we note that it is unclear exactly how a contractual duty that Black & Veatch owed to United was transformed into a duty that United owed to Foley. Nevertheless, we need not decide whether Foley demonstrated the existence of a duty by United to disclose all underground utilities to Foley because, even assuming that such a duty a existed, Foley failed to demonstrate that United breached a standard of care required of it.

First, to prove its negligence claim, Foley was required to present expert testimony as to United's standard of care to establish that United breached an alleged duty to disclose to Foley all underground utilities. See *Santopietro* v. *New Haven*, 239 Conn. 207, 226, 682 A.2d 106 (1996) ("[i]f the determination of the standard of care requires knowledge that is beyond the experience of an ordinary fact finder, expert testimony will be required"). Foley does not dispute the court's assessment, however, that "Foley offered no evidence defining the standard of care that applied to a party like [United] on a project such as this." Moreover, the court found that "the only credible evidence" regarding the industry standard was from Luis Cabreriza. Cabreriza testified that the industry practice actually was for the contractor, not the owner, to have the "responsibility of performing pot holing to identify utilities . . . ." This credibility finding is unassailable on appeal. See *Ruiz* v. *Gatling*, 73 Conn. App. 574, 576, 808 A.2d 710 (2002) ("[w]here the trial court is the arbiter of credibility, this court does not disturb findings made on the basis of the credibility of witnesses").

Second, the record supports the court's conclusion that United did not breach an unidentified standard of care by "not identifying every condition Foley might encounter . . . ." The court heard testimony that it was impossible to identify every underground obstacle in an urban environment, some of which had been abandoned for more than a century, before digging began. Foley does not dispute the court's finding that, before construction commenced, United "told Foley that [it] would encounter more obstacles than were shown on the drawings." The court's conclusion that United did not breach a duty owed to Foley is buttressed by the language of the contract specifications, which disclosed that Foley "shall conduct [its] operations on the basis that underground installations may exist that are not indicated on the drawings," and that "the accuracy and completeness of [the drawings] is unknown and is presented solely to assist [Foley] in an approximate determination of underground installations."

Indeed, the contract provided a mechanism by which

Foley could request compensation after encountering unexpected underground obstacles. Thus, the change order request process outlined in the contract supported the court's conclusion that the parties contemplated encountering unexpected underground utilities during construction. Consequently, the court's conclusion that United did not breach a duty owed to Foley because it did not disclose every underground utility was legally correct and supported by the record.

### 2

### Soil Testing

Foley additionally claims that the court improperly rejected its negligence claim because it had demonstrated that United "had a duty to perform soil testing and communicate the results to Foley," and that United's "failure to identify and reveal the true nature of the soil conditions" damaged Foley. We disagree.

Similar to Foley's negligence claim pertaining to underground utilities, the court found that there was no testimony or evidence presented regarding the standard of care required of a public utility company when testing soil and communicating the results to its contractor. Although Foley asserts that United "had a duty to fulfill its contractual obligations with the degree of care [of] a public utility provider of ordinary prudence," there was no evidence in the record from which the court could have ascertained the appropriate standard of care. The determination of the standard of care expected of United when testing soil and communicating the results to Foley "require[d] knowledge that [was] beyond the experience of an ordinary fact finder" and, thus, required expert testimony. *Santopietro* v. *New Haven*, supra, 239 Conn. 226. Therefore, the court's rejection of Foley's negligence claim was supported by the record.

### B

### CUTPA

Foley claims that the court improperly rejected its claim that United's conduct during the project violated CUTPA. Foley argues that it "proved numerous instances of unfair and deceptive acts or practices committed by [United]," which included United's failure: (1) to disclose the true extent of underground obstacles; (2) to disclose the extent of environmental hazards; (3) to process and pay change order requests in a timely manner; and (4) to "make timely payments to Foley for undisputed amounts that were due and owing." We are not persuaded.

"CUTPA provides in relevant part that [n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce. General Statutes § 42-110b (a). It is well settled that in determining whether a practice

violates CUTPA we have adopted the criteria set out in the cigarette rule by the federal trade commission for determining when a practice is unfair: (1) [W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise — in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers, [competitors or other businesspersons]. . . . All three criteria do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three. . . .

"It is well settled that whether a defendant's acts constitute . . . deceptive or unfair trade practices under CUTPA, is a question of fact for the trier, to which, on appellate review, we accord our customary deference. . . . [W]here the factual basis of the court's decision is challenged we must determine whether the facts set out in the memorandum of decision are supported by the evidence or whether, in light of the evidence and the pleadings in the whole record, those facts are clearly erroneous." (Internal quotation marks omitted.) *Centimark Corp.* v. *Village Manor Associates Ltd. Partnership*, 113 Conn. App. 509, 523, 967 A.2d 550, cert. denied, 292 Conn. 907, 973 A.2d 103 (2009).

On the basis of our review of the record, we conclude that the evidence supports the court's conclusions, and therefore, Foley's CUTPA claim has no merit. In rejecting Foley's prejudgment interest claim, we concluded that the evidence supported the court's determinations that United "had the right to dispute each of the issues on which it withheld payment," and that, even "[o]n the issues where the court has agreed with Foley . . . there was a good faith basis for [United's] position." Additionally, in rejecting Foley's negligence claim, we found support in the record for the court's determination that "not identifying every condition Foley might encounter" did not breach any duty that United may have owed to Foley. The same evidence upon which those findings were predicated also provided the basis for the court's determination that the defendant did not engage in any conduct prohibited by CUTPA.

Finally, the court heard testimony from United's project manager, Charles Maresca, that, when United solicited bids from potential contractors, it disclosed potential obstacles in a way intended to "ensure that the maximum amount of information that we could possibly give to all the bidders was going to be portrayed, be total[ly] represented on the plans . . . ." The record, thus, supports the court's conclusion that Foley

did not demonstrate that United engaged in unfair or deceptive acts or practices. We therefore reject Foley's CUTPA claim.

V

REQUEST FOR LEAVE TO AMEND COMPLAINT

Finally, Foley claims that the court improperly denied its request for leave to amend its complaint. We disagree.

The following facts and procedural history are relevant to the resolution of this claim. On June 1, 2012, Foley filed a request for leave to file a fifth amended complaint, in which Foley attempted to add counts sounding in negligent misrepresentation and common-law fraud. In a memorandum supporting its request, Foley asserted that the "two additional counts of negligent misrepresentation and common-law fraud by non-disclosure are variations of the tort counts previously pleaded." United objected to Foley's request on the grounds that the added claims were untimely, did not relate back to the operative complaint, and granting the request would delay the trial.

On July 25, 2012, the court denied Foley's request for leave to file an amended complaint. In an oral ruling, the court reasoned that the proposed fraud and negligent misrepresentation counts related exclusively to United's alleged conduct before the parties entered into the contract, but the allegations in the operative complaint pertained to United's alleged conduct after the parties had entered into the contract. The court, thus, concluded that the new counts in the proposed complaint did not relate back to the fourth amended complaint and, as a result, denied Foley's request for leave to amend.

On appeal, Foley asserts that the court improperly denied its request for leave to amend its complaint because "[t]he requested amendments did not present an 'entirely new and different factual situation,' but expanded the existing pleading." We are not persuaded.

Our standard of review of the plaintiff's claim is well defined. "While our courts have been liberal in permitting amendments . . . this liberality has limitations. Amendments should be made seasonably. Factors to be considered in passing on a motion to amend are the length of the delay, fairness to the opposing parties and the negligence, if any, of the party offering the amendment. . . . The motion to amend is addressed to the trial court's discretion which may be exercised to restrain the amendment of pleadings so far as necessary to prevent unreasonable delay of the trial. . . . Whether to allow an amendment is a matter left to the sound discretion of the trial court. This court will not disturb a trial court's ruling on a proposed amendment unless there has been a clear abuse of that discretion. . . . It is the [plaintiff's] burden in this case to demon-

strate that the trial court clearly abused its discretion." (Citations omitted; internal quotation marks omitted.) *Wagner* v. *Clark Equipment Co.*, 259 Conn. 114, 128, 788 A.2d 83 (2002).

"Our relation back doctrine provides that an amendment relates back when the original complaint has given the party fair notice that a claim is being asserted stemming from a particular transaction or occurrence, thereby serving the objectives of our statute of limitations, namely, to protect parties from having to defend against stale claims. . . . To relate back to an earlier complaint, the amendment must arise from a single group of facts. . . . In determining whether an amendment relates back to an earlier pleading, we construe pleadings broadly and realistically, rather than narrowly and technically. . . . [T]he complaint must be read in its entirety in such a way as to give effect to the pleading with reference to the general theory upon which it proceeded, and do substantial justice between the parties. . . . Our reading of pleadings in a manner that advances substantial justice means that a pleading must be construed reasonably, to contain all that it fairly means, but carries with it the related proposition that it must not be contorted in such a way so as to strain the bounds of rational comprehension. . . . Finally, in the cases in which [our Supreme Court has] determined that an amendment does not relate back to an earlier pleading, the amendment presented different issues or depended on different factual circumstances rather than merely amplifying or expanding upon previous allegations." (Citations omitted; internal quotation marks omitted.) *Grenier* v. *Commissioner of Transportation*, 306 Conn. 523, 559–60, 51 A.3d 367 (2012).

Both parties agree that the proposed counts were barred by the applicable statute of limitations unless the relation back doctrine applied. Our review of the fourth amended complaint reveals that its allegations exclusively pertained to the parties' conduct *after* the parties entered into the contract.[23] Specifically, the fourth amended complaint included nine counts. In five of the counts, Foley alleged either breach of contract claims, or sought damages related to that breach. In three of the other counts of the fourth amended complaint, Foley pleaded that United breached the implied covenant of good faith and fair dealing contained in the contract, interfered with Foley's contractual relationships with its subcontractors, and violated CUTPA through its conduct after the parties already had entered into the contract. In the sole remaining count of the fourth amended complaint, Foley pleaded that United was negligent because it breached its duty to Foley by not properly performing "its obligations and duties *under the . . . contract*." (Emphasis added.)

The fifth amended complaint, however, included allegations of fraud and negligent misrepresentation that

related solely to United's alleged misconduct *before* the parties entered into the contract. Specifically, in both proposed counts, Foley alleged that "[*p*]*rior to the execution of the contract*, [United] became aware that Foley would encounter many more utilities and obstacles that were not shown on the revised plans and specifications." (Emphasis added.) In the negligent misrepresentation count, Foley pleaded that United "let Foley enter into the contract" despite having this knowledge. In the common-law fraud count, Foley alleged that United "expected that if it informed Foley of the inaccuracies in the revised plans and specifications that Foley *would bid* the project differently." (Emphasis added.) Foley also alleged that, nevertheless, United "made the business decision not to disclose this information to Foley."

In the present case, the allegations in the proposed counts pertained exclusively to United's alleged misconduct prior to entering into the contract and, as a result, presented a different factual situation than the allegations of the fourth amended complaint, which pertained solely to postcontract conduct. The proposed complaint, thus, "present[ed] a new and different factual situation that would require the presentation of different evidence." *Sherman* v. *Ronco*, 294 Conn. 548, 556, 985 A.2d 1042 (2010). Our Supreme Court has determined that, in circumstances such as these, the court acts within its discretion by denying a request for leave to amend the complaint. See, e.g., *Alswanger* v. *Smego*, 257 Conn. 58, 61, 776 A.2d 444 (2001) (allegation of lack of informed consent regarding resident's participation in surgery did not relate back to allegation that defendants had failed to disclose all material risks in connection with plaintiff's surgery, care and treatment). Consequently, the court's decision to deny Foley's request for leave to amend the complaint was not an abuse of discretion and is supported by the record.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] Thus, in simpler terms, a delay in the critical path is a postponement to construction that affects the final completion date of the project.

[2] Black & Veatch coordinated the project on behalf of United and acted as United's agent during all relevant negotiations with Foley. Therefore, unless otherwise noted, Black & Veatch and United are referred to interchangeably throughout this opinion.

[3] The contract defines "substantial completion" in relevant part as "the date on which [Foley] has successfully completed the [w]ork . . . ."

[4] Polychlorinated biphenyls are commonly referred to as "PCBs." See *Northeast Ct. Economic Alliance, Inc.* v. *ATC Partnership*, 272 Conn. 14, 20, 861 A.2d 473 (2004). The court heard testimony that PCBs were a form of soil contamination.

[5] The record reveals that two distinct types of delays occurred during the project: crew delays and critical path delays. Crew delays quantified "how many days delay was experienced by the impacted crew . . . ." Critical path delays, on the other hand, measured delays to activities that determined the end date of a project. Crucially, crew delays did not equate to critical path delays.

[6] During the course of the project, Foley submitted 492 change order requests, which resulted in United issuing 294 change orders.

[7] The nine count operative fourth amended complaint included five counts sounding in breach of contract, a claim United breached the implied covenant of good faith and fair dealing, two tort claims, which sounded in negligence and tortious interference, and a claim that United's conduct violated the Connecticut Unfair Trade Practices Act, General Statutes § 42-110a et seq.

[8] The court ruled against United on a counterclaim in which United sought indemnification for settlement payments made to Foley's subcontractors. United has not appealed from any aspect of the court's ruling.

[9] Foley also claims that the court improperly determined that, even if timely, Foley had failed to prove its delay claim. This was a separate and independent ground upon which the court denied Foley's delay claim. Because we conclude that the court correctly ruled that Foley irrevocably waived and released its delay claim, we need not reach the court's separate ground for denying Foley's delay claim on its merits. See *Weiss* v. *Smulders*, 313 Conn. 227, 265, 96 A.3d 1175 (2014).

[10] Foley claims that certain delays were "undisputed" and solely attributable to United, and therefore were sufficient proof of critical path delays without any need to provide notice pursuant to the ten day rule. We disagree.

In fact, we see no reason why those delays somehow would be exempt from the ten day rule as well as the requirement of providing an analysis as to how those delays affected the completion deadline. Indeed, the contract authorized Foley to submit a claim for additional compensation for "[a]ny [c]laims" that caused an extension of the completion deadlines.

[11] The court also heard from two witnesses that further clarified the crew delay/critical path delay distinction. Stephen Pitaniello, United's expert witness, explained: "[A] day of delay on the critical path affects the end date of the project by a day. There are other delays that don't impact the critical path. So something may start late, something may end late, but if it's not on the critical path, it doesn't affect the end date of the project." Jeremy Robards of Black & Veatch testified that, when delays occurred to one area of construction, a contractor might have the ability to divert its crew to another area, or work around the delayed area, and, thus, would be able to avoid delaying the end date of the project.

[12] Similarly, Foley claims that the language that United included in its change orders following the issuance of the August, 2007 letter renders erroneous the court's determination that United did not waive the ten day rule. We are not persuaded.

Following the release of the August 2007 letter, United included the following language in its change orders: "It is agreed that [a specified number of] crew days are attributable to this change and that the significance of this designation of time and the delay and impact costs associated with same shall be in accordance with [United's] letter dated August 28, 2007 . . . which shall be part of this agreed change."

This language, like that of the August, 2007 letter, merely distinguished crew delays from critical path delays. This language did not signify that United had waived the ten day rule in relation to critical path delay claims.

[13] Foley claims, for the first time on appeal, that the court improperly failed to find that it "substantially complied" with the notice provision of the contract. Because this claim was not raised before the trial court, we decline to address the claim on appeal. See *DuBaldo Electric, LLC* v. *Montagno Construction, Inc.*, 119 Conn. App. 423, 443, 988 A.2d 351 (2010) ("[t]o review claims articulated for the first time on appeal and not raised before the trial court would be nothing more than a trial by ambuscade of the trial judge" [internal quotation marks omitted]).

[14] Foley additionally claims, for the first time on appeal, that the court's interpretation of the markup provision "has the absurd consequence of promoting litigation as a way to avoid payment of valid contractual markup provisions." Foley did not make this claim in the trial court and, instead, relied solely on its argument regarding the contract's plain language. Accordingly, we decline to consider this claim on appeal. See Practice Book § 60-5 ("[t]he court shall not be bound to consider a claim unless it was distinctly raised at the trial or arose subsequent to the trial"); *Alexandre* v. *Commissioner of Revenue Services*, 300 Conn. 566, 585–86, 22 A.3d 518 (2011).

[15] As the court accurately noted, "[p]arties often settle for a variety of reasons." "The numerous factors that affect a litigant's decision whether to compromise a case or litigate it to the end include the value of the particular proposed compromise, the perceived likelihood of obtaining a still better settlement, the prospects of coming out better, or worse, after a full trial, and the resources that would need to be expended in the attempt." (Internal quotation marks omitted.) *United States Securities & Exchange Commis-*

*sion* v. *Citigroup Global Markets, Inc.*, 752 F.3d 285, 295 (2d Cir. 2014).

[16] General Statutes § 37-3a (a) provides in relevant part: "[I]nterest at the rate of ten per cent a year, and no more, may be recovered and allowed in civil actions or arbitration proceedings under chapter 909, including actions to recover money loaned at a greater rate, as damages for the detention of money after it becomes payable. . . ."

[17] The record reflects that these change orders resulted in more than $25,000,000 in additional compensation for Foley.

[18] The court only addressed eleven change order requests in its memorandum of decision because the parties resolved one change order request during trial.

[19] General Statutes § 42-158i (3), contained within chapter 742b governing construction contracts, defines retainage in relevant part as "a sum withheld from progress payments to the contractor or subcontractor, otherwise payable to a contractor or subcontractor by an owner conditioned on substantial or final completion of all work . . . but does not include any sum withheld due to the contractor's or subcontractor's failure to comply with construction plans or specifications."

[20] General Statutes § 42-158j governs the required contract provisions regarding the timely payment of contractors and the remedy for untimely payments. Subsection (c) (4) of § 42-158j entitles a contractor to receive interest at the rate of 1 percent per month after the other party to the contract has received notice of an outstanding "amount due and owing." See also General Statutes § 42-158j (a).

[21] Foley additionally challenges the court's rejection of its CUTPA claim. We address that claim in part IV B of this opinion.

[22] Foley asserts that the court improperly "denied Foley's negligence claims based on its conclusions that there was no evidence 'that [United] owed some duty to Foley that did not arise out of the contract.' " Our review of the court's decision, however, reveals that the court based its conclusion not only on the lack of evidence of a duty United owed to Foley, but also on Foley's failure to present evidence as to the standard of care and Foley's failure to demonstrate that United breached that undefined standard.

[23] For the purposes of the relation back doctrine, a subsequent amended complaint may be compared to an earlier amended complaint so long as the earlier amended complaint has been filed within the applicable statute of limitations. See *Deming* v. *Nationwide Mutual Ins. Co.*, 279 Conn. 745, 775, 905 A.2d 623 (2006).